IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 04-cv-01395-RPM

CAROLE STRICKLAND,

       Plaintiff,

v.

UNITED PARCEL SERVICE, CO.,

       Defendant.

---

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

In June 2004, Ms. Carole Strickland brought suit against her former employer, United Parcel Service, Co. ("UPS") in the District Court for El Paso County, Colorado, claiming *inter alia* that the defendant had subjected her to gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 *et seq.*, and that the defendant had interfered with her rights under the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* (FMLA). The defendant removed the action to this court, asserting federal jurisdiction under 28 U.S.C. §§ 1331, 1332, 1367 and 1441. In an amended complaint, filed August 3, 2004, the plaintiff alleges five claims for relief: (1) gender discrimination in violation of Title VII and the Colorado Anti-Discrimination Act; (2) retaliation in violation of Title VII; (3) interference with the plaintiff's rights under FMLA; (4) breach of contract, and (5) breach of the covenant of good faith and fair dealing.

On June 8, 2005, the defendant moved for summary judgment, arguing that all of the plaintiff's claims fail as a matter of law. The court heard oral argument on the motion on April 19, 2006. The plaintiff has shown some evidentiary support for the following statement of facts.

: In January 2000, the plaintiff was hired as a full-time package car driver at the UPS Colorado Springs facility. In January 2001, the plaintiff was promoted to the position of sales account executive in the hundredweight department, based out of UPS's Englewood facility. The plaintiff worked as an account executive in the hundredweight department for approximately one year.

In January 2002, the plaintiff moved to a different sales position and became a key account executive at the UPS facility in Colorado Springs. The responsibilities of a key account executive include sales and business development. For each key account executive, UPS prepares a yearly sales plan setting forth an expected level of activity and sales required to meet the company's growth objectives.

In early January 2002 – approximately the same time that the plaintiff became a key account executive in Colorado Springs – Mr. Troy Roten became the supervisor of the account executives in Colorado Springs. Mr. Roten reported to Mr. Jack Donnell, the director of sales. Even before Mr. Roten officially assumed his supervisory role, some account executives who had worked previously with Mr. Roten had concerns about his managerial skills. In December 2001, Mr. Roten met with members of the sales team he would be supervising, including the plaintiff. Mr. Roten encouraged the members of this sales team to express their feelings. At that meeting, the plaintiff and another account executive, Mr. Cory Bishop, told Mr. Roten that they felt uncomfortable approaching him and found it difficult to have their questions answered by him.

In January 2002, the plaintiff and other account executives on her sales team met with Mr. Donnell at a Village Inn restaurant in Colorado Springs.  The purpose of the meeting was to discuss Mr. Roten's managerial style.  Mr. Roten was not present at that meeting.  This meeting was conducted pursuant to the "Open Door" step of the company's Employee Dispute Resolution (EDR) Guidelines.  (Ex. 6 to Pl.'s opp'n br.).  The plaintiff and Mr. Bishop told Mr. Donnell that Mr. Roten was unapproachable and not helpful when they had questions.  They also told Mr. Donnell that Mr. Roten had instructed them not to complain to Mr. Donnell.  The result of the meeting was that Mr. Donnell agreed to talk with Mr. Roten about the employee's complaints. Mr. Donnell also reviewed with the account executives the appropriate channels of communication within the organization.  He told them that they should address problems first with Mr. Roten, and then with him and/or the human resources department if problems persisted.

The plaintiff's difficulties with Mr. Roten continued after this meeting with Mr. Donnell. In August 2002, the plaintiff attempted to contact Mr. Donnell to discuss her problems with Mr. Roten.  On one occasion when the plaintiff told Mr. Roten that she wanted to talk with Mr. Donnell, Mr. Roten became upset with her.

The plaintiff took a medical leave of absence on September 23, 2002, at the suggestion of Mr. Roten.  She received treatment on two or more occasions from Scott Gregory, a licensed family and medical therapist.

The plaintiff authorized the release of her medical records to Kemper National Services, the administrator of the UPS Flexible Benefits Plan.  On September 27, 2002, Kemper wrote a letter to the plaintiff stating:

Based upon the information received, it appears that you are currently disabled from performing the essential job functions.

You have been initially authorized for benefits effective September 23, 2002, and UPS has been informed of this authorization.  Please note that this period may run concurrently with any leave entitlement you may have under the Family Medical Leave Act (FMLA) or any applicable state law.  Based on the medical documentation received from your physician, your leave is approved until October 3, 2002.

(Ex. 3 to pl.'s opp'n br.).

Ms. Strickland returned to her job on October 9, 2002.  The leave from September 23, 2002 through October 8, 2002, was characterized as short-term disability leave, for which she was paid.

When the plaintiff returned to work on October 9, 2002, she met with Mr. Roten, Mr. Donnell, and Mr. John Cooper of the UPS human resources department.  They discussed the plaintiff's readiness to return to work.  The discussion then turned to the plaintiff's job performance.  The plaintiff was told that her performance had declined and was not where it needed to be.  The plaintiff was told that she needed to make some major changes to improve her performance.

Sales reports for the third quarter of 2002 show that Ms. Strickland was performing on all measures at 90% or above.  (Ex. 9 to pl.'s opp'n br.).  For this time period, account executives who achieved 85% of their sales plan were entitled to bonuses.  The plaintiff received a bonus for the third quarter.

During October, November, and December 2002, Mr. Roten sent the plaintiff frequent email communications about her job performance.  (Ex. 8 to pl.'s opp'n br.).  In these emails, Mr. Roten reminded the plaintiff about her sales goals and repeatedly questioned her about how she

-4-

was going to attain those goals.  On October 17, 2002,  the plaintiff met with Mr. Roten,

Mr. Donnell, and Mr. Cooper.  An email written by Mr. Roten about that meeting states, "[t]he

necessary improvement is to be on plan at 100% plus at a minimum expectation." [sic]  (*Id.* at

UPS-00107).  Mr. Donnell and Mr. Roten met with the plaintiff on November 1, 2002, and again

on November 15, 2002, to review her "unacceptable results/performance."  (*Id.* at UPS-00063

and UPS-00064).

In November 2002, the plaintiff began treatment with her primary care physician,

Dr. Doug Swanson, for symptoms of stress, inability to sleep, nausea and diarrhea.

On December 2, 2002, Ms. Strickland met with Mr. Roten and Mr. Donnell.  She had

complained that she felt she was "being singled out."  On December 5, 2005, she wrote an email

letter explaining that basis for that complaint.  She stated that her "performance had never been

questioned before she went out on disability," and also stated, "The reason I feel that I am being

singled out is because I feel there are other employees that are not at 100% to plan, and feel that

they are not receiving the treatment that I am." (Ex. 8, UPS-00128).

Exhibit 9 to the plaintiff's opposition brief is a report showing the plaintiff's sales results

for the calendar year 2002.  Plaintiff's exhibit 10 is a five page document showing the sales of five

male account executives for the same time period.  Comparison of these documents shows that

the plaintiff's sales performance for 2002 was similar to the results achieved by Mr. Donald

Stephas and Mr. David Napikoski, and her performance was better than the performances of

Mr. Mark McNulty, Mr. Jonathon Boyd and Mr. Paul Deaton.  (*See also* pl.'s ex. 20, tendered at

the hearing on April 19, 2006).

On January 7, 2003, the plaintiff met with Mr. Roten, Mr. Donnell, and Mr. Stefan Wilson, a UPS human resources manager.  At that meeting the plaintiff was required to submit a written commitment about how she would meet her sales plan.  Mr. Donnell testified in his deposition that the plaintiff was put on a "progressive discipline path."  (Donnell dep.138:17 – 140:15).  The plaintiff received a performance review that month.  (Ex. 12 to pl.'s opp'n br.).  The plaintiff's performance was assigned a low numerical rating.

In mid-January 2003, the plaintiff left work because she was not feeling well.  She went to see her doctor and then called Mr. Roten and told him she wouldn't be back.  She did not return to work.

On February 10, 2003, the plaintiff's attorney wrote a letter to Mr. Stefan Wilson, at UPS human resources, claiming gender discrimination and retaliation.  (Ex. 16 to pl.'s opp'n br.).  The letter stated that Ms. Strickland had been released by her doctors to return to work, and that "Ms. Stickland remains interested in continuing her employment with UPS" if she could avoid "Mr. Roten's and Mr. Donnell's discriminatory behavior."  (*Id.*).  On March 25, 2003, the plaintiff's counsel wrote a letter to the UPS legal department regarding the plaintiff's claims of discrimination.  (Ex. 17 to pl.'s opp'n br.).

The plaintiff testified in her deposition that in May 2003 UPS offered to employ her as a key account executive in Denver, or in Fort Collins, Colorado, or as an on-call supervisor in Montana, but that she declined those offers because she lived in Colorado Springs and she did not want to commute or relocate.  (Strickland dep. 240:15 – 246:13).

On March 12, 2004, after the plaintiff had been on leave for approximately one year, UPS terminated her employment.  (Ex. I to def.'s reply br.).

1.    **The first claim for relief: discrimination based on gender
in violation of Title VII**

In her first claim for relief, the plaintiff alleges that she was subjected to a gender-biased

hostile work environment and disparate treatment.  (Am. Compl. ¶¶ 19-21).

"For a hostile work environment claim to survive a summary judgment motion, 'a plaintiff

must show that a rational jury could find the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'" *Penry v. Fed. Home Loan

Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting *Davis v. U.S. Postal Service*,

142 F.3d 1334, 1341 (10th Cir. 1998)).  "The plaintiff must produce evidence that she was the

object of harassment because of her gender."  *Penry,* 155 F.3d at 1261.

The plaintiff complains that Mr. Roten subjected her to a barrage of supervisory emails,

telephone calls and meetings concerning her work performance.  A hostile work environment

claim may be established by evidence showing that an employee was subjected to excessive

supervision or monitoring due to gender hostility.  The difference in treatment of male account

executives with comparable sales records may fairly give rise to an inference of gender bias.

Mr. Cory Bishop, who did receive comparable treatment, also brought suit against UPS, alleging

that UPS violated his FMLA rights and breached contractual obligations by subjecting him to

retaliation.  There are genuine issues of material fact about how the plaintiff was treated in

comparison to the treatment of similarly-situated males under Mr. Roten's supervision.

To establish a prima facie case of disparate treatment in violation of Title VII, plaintiff

must prove that she is a member of a protected class, that she suffered an adverse employment

action, and that the adverse action occurred under circumstances which give rise to an inference of unlawful discrimination. *See Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000).

The defendant argues that there is no evidence that the plaintiff suffered an adverse employment action. The testimony of Mr. Donnell stating that the plaintiff was put on a path of progressive discipline in January 2003 is sufficient to create a factual issue about whether the plaintiff was subjected to an adverse employment action. In addition, the plaintiff's testimony relating to her claim of constructive discharge also supports her allegation that she was subjected to an adverse employment action. As discussed above, there are genuine issues of material fact regarding how the plaintiff was treated in comparison to similarly situated male account executives.

### 2. The second claim for relief: retaliation under Title VII

The plaintiff also claims that she was subjected to retaliation in violation of Title VII. To establish this claim, the plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the adverse employment action and the protected activity. *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). The defendant argues that there is no evidence of an adverse employment action, and no evidence of a causal connection between protected activity and any adverse employment action.

The plaintiff's response brief clarifies that the protected activity occurred on December 2, 2002, when the plaintiff reported to Mr. Roten and Mr. Donnell that she felt "singled out." The plaintiff submitted evidence showing that she was put on a path of progressive discipline the next

month.  The questions of whether the plaintiff suffered an adverse employment action and whether such action was causally related to the protected activity are matters to be determined by the jury at trial.

### 3.  The third claim for relief:  interference in violation of 29 U.S.C. § 2615

In her third claim for relief, the plaintiff alleges, "Defendant's creation of working conditions which were so difficult and intolerable that a reasonable person in the Plaintiff's position would have no other choice but to resign was retaliatory and was in violation of 29 U.S.C. § 2615."  (Am. Compl. ¶ 33).  Under FMLA, an employee is entitled to a total of twelve weeks of unpaid leave during any 12-month period when the employee is absent due to a serious health condition that makes the employee unable to perform the functions of the position.  29 U.S.C. § 2612(a)(1)(D) and (c).  Interference with an employee's rights under FMLA is expressly prohibited.  29 U.S.C. § 2615.  Employers are also prohibited from discriminating against employees who take FMLA leave.  29 C.F.R. § 825.220(c).  The plaintiff claims that the defendant violated FMLA by retaliating against her for taking medical leave from September 23, 2002, through October 8, 2002.

Regulations promulgated pursuant to FMLA provide that an employee who requests FMLA leave must notify the employer of the leave request.  *See* 29 C.F.R. §§ 302, 303.  The defendant argues that the plaintiff's third claim fails because there is no evidence showing that she notified UPS that she considered her leave of absence in the fall of 2002 to be FMLA leave.

The appropriate question is whether "the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."  *Medina v. Coors Brewing Co.*, No. 99-1463, 2000 WL 1651306, **1 (10th Cir. Nov.

3, 2000) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).  The

employee's obligation is to provide enough information about the reason for the absence to

inform the employer that FMLA may apply.  *Medina*, 2000 WL 1651306 at ** 1; *Collins v. NTN-

Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001).

It is undisputed that Ms. Strickland notified her supervisor and the UPS human resources

department of her request for medical leave in September 2002.  She authorized the release of her

medical records, and Kemper National Services determined that the plaintiff was eligible for short

term disability benefits and leave.  Kemper's letter dated September 27, 2002 stated, "Based on

the information received, it appears that you are currently disabled from performing the essential

job functions."  The letter stated that UPS had been informed of the benefits authorization, and

also stated:  "Please note that this period may run concurrently with any leave entitlement that you

may have under the Family and Medical Leave Act (FMLA) or any applicable state law."  The

plaintiff provided sufficient information to apprise UPS of her request to take time off for a

serious medical condition.

The defendant argues that the plaintiff has admitted that she did not have a FMLA-

qualifying medical condition when she was absent from work in the fall of 2002 by her deposition

testimony that she did not consider herself to be suffering from a serious health condition in

September 2002.

Under FMLA, "an illness, injury, impairment, or physical or mental condition that involves

. . . continuing treatment by a health care provider" falls within the definition of a "serious health

condition."  29 C.F.R. § 825.114(a)(2).  A serious health condition involving continuing treatment

by a health care provider includes a period of incapacity (i.e. inability to work) of more than three

consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves treatment two or more times by a health care provider. 29 C.F.R. § 825.114(a)(2)(i)(A). Undisputed evidence shows that the plaintiff received treatment on two or more occasions from Dr. Gregory while she was absent from work for approximately two weeks in the fall of 2002.

The defendant's argument about the plaintiff's medical condition is inconsistent with the response it gave to the plaintiff's first set of interrogatories in the action *Bishop v. United Parcel Service, Co.*, Civil Action No. 04-cv-1227-MK-PAC, in the United States District Court for the District of Colorado. In that action, the plaintiff requested that UPS identify all UPS employees in Colorado who had requested and been approved for leave pursuant to FMLA since 1999, and asked that the defendant identify the dates that FMLA leave was utilized. In response, the defendant identified the plaintiff and specified her leave from September 23, 2002 through October 9, 2002. (Ex. 1 to pl.'s opp'n br.). The Kemper letter is consistent with the treatment of this absence as FMLA leave.

The defendant argues that there is no evidence that it interfered with, restrained, or denied the plaintiff's FMLA rights. The defendant points out that the plaintiff availed herself of the opportunity to take medical leave, and she was not discouraged or prevented from doing so.

In addition to prohibiting interference with an employee's FMLA rights, FMLA also prohibits retaliation against those who exercise those rights. Claims for retaliation under FMLA are analyzed according to the framework applicable to claims under Title VII. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003). To state a prima facie claim for retaliation, the plaintiff must show that (1) she availed herself of a protected right under FMLA;

(2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir. 1997). As discussed above, the plaintiff has produced sufficient evidence to support each element of her retaliation claim. The weight to be given to that evidence is for the jury to determine at trial.

### 4. The fourth claim for relief: breach of contract

The plaintiff's fourth claim for relief is for breach of contract. The plaintiff alleges that UPS breached its agreement to "treat Strickland 'with dignity,' to provide her an 'impartial, rewarding and cooperative environment with the opportunity for advancement,' and 'to prohibit retaliation for her exercise of legal rights.'" (Am. Comp. ¶ 42).

The plaintiff's opposition brief clarifies that this claim is for breach of a term of employment provided in the UPS Employment Dispute Resolution Guidelines. The plaintiff asserts that when she and other employees met with Mr. Donnell in January 2002 to discuss their problems with Mr. Roten's management style, that was a meeting conducted pursuant to the "Open Door" step of the company's EDR Guidelines. According to the plaintiff, her discussions with Mr. Donnell about Mr. Roten were "open door" discussions. The EDR Guidelines state, "The Company will not retaliate against any employee in any way for using the Open Door." The deposition testimony and documentary evidence submitted by the plaintiff show that there are factual issues regarding whether Mr. Roten retaliated against the plaintiff for using the company's Open Door Policy.

### 5. The fifth claim for relief: breach of the covenant of good faith and fair dealing

In the fifth claim for relief, the plaintiff alleges that the plaintiff breached contractual duties by failing to treat her fairly. (Am. Compl. ¶¶ 46-50). The defendant moves for judgment on this

claim, arguing that it is based on the UPS Policy Book, and the Policy Book expressly disclaims any intent to be contractually binding.  During oral argument, plaintiff's counsel clarified that the claim is not based on the Policy Book alone, but also arises from statements made by managers at meetings with UPS employees.  The defendant's legal arguments, which are directed to the Policy Book, do not provide a basis for summary judgment.

Based on the foregoing, it is

ORDERED that the defendant's motion for summary judgment is denied.

Dated: April 26, 2006.

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge